(948 P.2d 670)

No. 77,288

B. NATHALIE STEINLE, *Appellant*, v. RICHARD G. KNOWLES d/b/a F.S. ALLEN ABSTRACT AND TITLE COMPANY, CHICAGO TITLE INSURANCE COMPANY, and F.S. ALLEN ABSTRACT AND TITLE COMPANY, INC., *Appellees*. CHICAGO TITLE INSURANCE COMPANY, *Appellee*, v. ERVYL L. STEINLE and B. NATHALIE STEINLE, *Appellants*.

Opinion filed November 21, 1997.

*Christopher A. McElgunn*, of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, for the appellant B. Nathalie Steinle.

*Kenneth G. Gale*, of Focht, Hughey & Calvert, L.L.C., of Wichita, for the appellees.

Before MARQUARDT, P.J., PIERRON, J., and NANCY E. PARRISH, District Judge, assigned.

PIERRON, J.: The facts in this case are somewhat complex. B. Nathalie Steinle brought suit against appellees Richard G. Knowles, d/b/a F.S. Allen Abstract and Title Company, Chicago Title Insurance Company (Chicago Title), and F.S. Allen Abstract and Title Company, Inc. (Allen Abstract). She alleged, in relation to a title insurance policy issued by Chicago Title, breach of contractual duty to defend, negligence, negligent misrepresentation, and breach of warranty.

In another suit which was consolidated with Steinle's claim, Chicago Title sued Steinle and her husband, Ervyl Steinle, under a subrogation clause in the title insurance policy to recover monies

it expended to satisfy a claim by a third party under the title insurance policy.

The trial court granted summary judgment for Chicago Title on Steinle's tort claims because it found the title insurance contract did not require it to provide Steinle a defense under these facts. The court granted Chicago Title's subrogation claim against Steinle and ordered Steinle to pay $7,423.78 in damages.

The case was tried on stipulated facts and exhibits.

In 1972, the subject property was deeded to Steinle from the previous owners with the following legal description: The west 33 acres (more or less) of the N ½ of the NE ¼ of Section 9, TWP 27, Range 3 East, located in Butler County, Kansas.

In 1986, Steinle entered into a contract to sell the property to Don and Guyla Glaesman. The contract utilized a legal description different from the description in the original deed to Steinle. The new legal description was obtained from a survey Steinle had performed some years earlier. The new legal description included property to which Steinle did not have title, including a 2-rod strip on the east side of the property and parcels on the north side which belonged to the Kansas Turnpike Authority (KTA).

The purchase contract with the Glaesmans provided for a portion of the purchase price to be paid through a promissory note to Steinle in the amount of $35,000, to be secured by a mortgage held by Steinle.

Steinle and the Glaesmans ordered title insurance from Chicago Title. Chicago Title issued a title insurance commitment through Knowles, an authorized agent. Steinle does not remember whether she reviewed the title commitment before closing.

The Glaesmans and Steinle closed on the contract in March 1986. Allen Abstract handled the closing. A warranty deed from Steinle to the Glaesmans and a mortgage from the Glaesmans to Steinle were issued, both using the new legal description. Steinle signed the warranty deed to the buyers. The deed purported to convey property to which Steinle did not have good and complete title. Chicago Title issued title insurance policies to the Glaesmans' title and to Steinle.

Steinle paid a portion of the Glaesmans' title insurance premium and a closing fee to Allen Abstract. No other monies were paid to the Glaesmans by Steinle.

Later in 1986, a dispute arose concerning the ownership of the east 2 rods of the property. A quiet title action was begun, and Steinle was added as a party to that action. To resolve this action, Steinle expended funds for legal counsel and in the final settlement. The quiet title action was settled.

In March 1993, the Glaesmans brought an action against all the parties in this case, among others. They alleged that Steinle misrepresented various features of the property, including the ownership of the property held by the KTA and included within the legal description conveyed. At the time of the pretrial conference, the claim also alleged a breach of warranty of title.

Steinle requested that Chicago Title provide a defense in the litigation. The request was refused, and Steinle provided for her own defense. At no time during the litigation was the validity of Steinle's mortgage on the property challenged. As a result of the alleged title defect, the value of the subject property was never reduced below the balance of the promissory note held by Steinle from the Glaesmans.

During the Glaesman litigation, Steinle filed claims against Chicago Title. The parties to the present action stipulated to an order reserving claims.

In 1994, Chicago Title purchased the KTA property for the Glaesmans, thus curing the title. Steinle reduced the mortgage by $2,000 as a contribution to the settlement of the Glaesman litigation.

Steinle first filed her claim of negligence against Knowles and Allen Abstract on June 7, 1993, in her amended answer and cross-claim in the Glaesman litigation. The title commitment and the title insurance policies issued by Chicago Title did not exclude from coverage the interest held by the KTA. The interest held by the KTA was of public record.

Since this case was tried on stipulated facts and exhibits, we note:

" 'Where the controlling facts are based upon written or documentary evidence by way of pleadings, admissions, depositions, and stipulations, the trial court has

no peculiar opportunity to evaluate the credibility of witnesses. In such situation, this court on appellate review has as good an opportunity to examine and consider the evidence as did the court below, and to determine *de novo* what the facts establish.' [Citation omitted.]" *Kneller v. Federal Land Bank of Wichita,* 247 Kan. 399, 400, 799 P.2d 485 (1990) (quoting *Smith v. Williams,* 227 Kan. 32, Syl. ¶ 2, 605 P.2d 86 [1980]).

We first examine the question of whether the title insurance policy limits Chicago Title's duty to defend Steinle to only litigation which asserts the invalidity of Steinle's mortgage.

The title insurance policy is titled "American Land Title Association Loan Policy" and states:

"SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF, CHICAGO TITLE INSURANCE COMPANY, . . . insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the amount of insurance stated in Schedule A, and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:

1. Title to the estate of interest described in Schedule A being vested otherwise than as stated therein;
2. Any defect in or lien or encumbrance on such title;
3. Lack of a right of access to and from the land;
4. Unmarketability of such title;
5. The invalidity or unenforceability of the lien of the insured mortgage upon said estate or interest except to the extent that such invalidity or unenforceability, or claim thereof, arises out of the transaction evidenced by the insured mortgage and is based upon
   (a) usury, or
   (b) any consumer credit protection or truth in lending law;
6. The priority of any lien or encumbrance over the lien of the insured mortgage;
7. Any statutory lien . . . ; or
8. The invalidity or unenforceability of any assignment . . . of the insured mortgage or the failure of said assignment to vest title to the insured mortgage in the named insured assignee free and clear of all liens."

In the section of the title policy entitled "Conditions and Stipulations," a section entitled "Defense and Prosecution of Actions" states:

"The Company, at its own cost and without undue delay, shall provide for the defense of an insured in all litigation consisting of action or proceedings commenced against such insured, or defenses, restraining orders or injunctions inter-

posed against a foreclosure of the insured mortgage or a defense interposed against an insured in an action to enforce a contract for sale of the indebtedness secured by the insured mortgage, or a sale of the estate or interest in said land, to the extent that such litigation is founded upon an alleged defect, lien, encumbrance, or other matter insured against by this policy."

The trial court held: "The loan title policy issued to the plaintiff provides no coverage for her defense of an action brought against her as seller of property. She was an insured only as to the mortgage title policy." The court stated, at the hearing on the summary judgment motions:

"Ms. Steinle received the mortgage title policy in her role as mortgage lender, not in her role as seller. And that's the context that that broad, admittedly broad, insurance coverage provision has to be interpreted, and I don't think she's entitled to stretch the coverage even for the purpose of the duty to defend, stretch the purpose of the mortgage title insurance contract to cover defense of her need for a defense as seller in the transaction. She was an insured, but only as to the mortgage title insurance policy."

Several legal standards should be kept in mind as the title insurance contract is analyzed. "Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect." *Federal Land Bank of Wichita v. Krug*, 253 Kan. 307, Syl. ¶ 2, 856 P.2d 111 (1993). "Where the language of the contract is clear and can be carried out as written, there is no room for construction or modification of the terms." *Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, Syl. ¶ 8, 876 P.2d 1362 (1994). "Whether an ambiguity exists in a written instrument is a question of law to be decided by the court. [Citation omitted.]" *Kennedy & Mitchell, Inc. v. Anadarko Prod. Co.*, 243 Kan. 130, 133, 754 P.2d 803 (1988). "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 693, 840 P.2d 456 (1992).

Further, the language of the contract must be construed against Chicago Title because it prepared the contract and its language. See *Gowing v. Great Plains Mutual Ins Co.*, 207 Kan. 78, 80, 483 P.2d 1072 (1971).

In short, the language in a policy of insurance purporting to restrict coverage must do so clearly. We follow this rule due to the superior position of the insurance company in regard to contract language.

"Typical of the adhesion contract, and one of its most prominent examples, is the insurance contract or policy, which possesses the distinctive characteristic of unequal bargaining strength or bargaining status between seller and purchaser, or the insurer and the insured. [Citations omitted.]

"The terms of today's standard insurance policy are predetermined by the insurance carrier itself and, long in advance of the individual insurance sale, those terms have been incorporated into the insurance package presented to the prospective buyer. . . . The buyer's freedom of choice in selecting a policy is severely limited; if he desires . . . insurance he must normally accept the printed policy with the usual printed provisions—else he can leave it." 207 Kan. at 80.

Steinle contends the Chicago Title insurance policy provided coverage for the Glaesman litigation and required Chicago Title to provide her a defense because that litigation presented more than a mere possibility that a covered claim existed. If the facts presented indicate any " 'potential of liability' under the policy, the insurer bears a duty to defend." *Spivey v. Safeco Ins. Co.*, 254 Kan. 237, Syl. ¶ 2, 865 P.2d 182 (1993). "[The possibility of coverage] may be remote, but if it exists, the company owes the insured a defense." 254 Kan. 237, Syl. ¶ 2.

This court must, therefore, determine whether there is any possibility that the Glaesman litigation fell within the policy's coverage. Chicago Title contends, as the trial court found, that the title policy was for Steinle a lender's policy only and did not provide any coverage for Steinle as a seller.

Chicago Title points to the title of the policy, "Loan Policy," and contends it covers only defects to the buyer's title which would affect the mortgage held by Steinle. The amount of coverage is only $35,000, which corresponds with the amount of the mortgage. The mortgage is specifically listed as the "insured mortgage."

In the Glaesman litigation, the Steinles were alleged, as sellers, to have made false representations about the location and nature of a road on the property and that the property could be developed.

The Glaesmans also alleged negligent misrepresentation and breach of warranty of title.

Chicago Title recognizes the duty to defend when there is a potential of liability under the policy but asserts that because the Glaesman litigation alleges acts that are clearly not covered by the policy, there is no potential of liability, and thus no duty to defend. See *Spivey*, 254 Kan. 237, Syl. ¶ 4.

While it may have been the intent of Chicago Title to restrict its coverage only to the extent necessary to protect the value of the mortgage, its policy did not do so. The language of the policy as it applies to this factual situation is difficult to grasp. As we read the policy, it contracted to provide a defense to the insured for the type of title breach involved here.

Insureds are not required to engage in linguistic gymnastics to ascertain the intent of the insurer. Titling the contract a loan policy does not abrogate the clear language of the policy. The language of a policy purporting to restrict coverage must do so clearly. Chicago Title at least guaranteed clear title up to $35,000. Under the language of this policy, it is liable for damages up to that amount and to provide a defense.

The second issue is whether Steinle's claims for negligence or breach of warranty are time barred. We believe they are.

The trial court granted Chicago Title summary judgment on Steinle's tort claims.

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260-61, 891 P.2d 435 (1995).

The trial court ruled: "The plaintiff had notice of the defect in the title search performed by the defendants in 1986. . . . The tort claims asserted against the defendants by the plaintiff accrued in 1986 and are therefore barred by the two-year statute of limitations."

At the hearing, the trial court stated that because the journal entry in the quiet title action specifically mentions the areas which were disputed as a result of the incorrect legal description, Steinle, "at the very least, had notice in that litigation back in 1986, and should have known, if she didn't know, that there was a problem, and that there was a defect, and that there was a challenge."

The applicable statute of limitations for negligence is 2 years. K.S.A. 60-513(a)(4). Breach of an implied warranty of workmanlike performance has a 3-year statute of limitations. *Zenda Grain & Supply Co. v. Farmland Industries, Inc.,* 20 Kan. App. 2d 728, Syl. ¶ 8, 894 P.2d 881 (1995). The Glaesman action, where Steinle first brought the actions against appellees, was filed in 1993. Because the causes of action accrued at least by 1986, they are time barred.

Steinle contends the trial court erred in granting summary judgment on the statute of limitations issue because it ignored the material issue of fact as to whether the Steinles knew of the appellees' negligence.

" '[A]n issue of fact is not genuine unless it has legal controlling force as to a controlling issue. A feigned or imaginary issue is not a genuine issue. A disputed question of fact which is immaterial to the issues does not preclude summary judgment. If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of material fact.' [Citation omitted.]" *Seabourn v. Coronado Area Council, B.S.A.,* 257 Kan. 178, 189, 891 P.2d 385 (1995).

It would appear that if it was obvious in the quiet title action that there was a defect in title that appellees had not discovered, they were negligent. If Steinle did not know of the negligence at the time, she should have. The trial court ruled that Steinle either knew of the appellees' negligence, or should have known of it, as of the 1986 litigation. Therefore, even if Steinle did not know of the appellees' negligence, that fact is not material because the trial court correctly ruled that Steinle should have known of the negligence in 1986.

" ' "[A]n injured party has a positive duty to use diligence in discovering his cause of action within the limitations period. Any fact that should excite his suspicion is the same as actual knowledge of his entire claim." ' [Citation omitted.]" *McCaffree Financial Corp. v. Nunnink*, 18 Kan. App. 2d 40, 52, 847 P.2d 1321 (1993). The trial court did not err by ruling Steinle's tort claims were barred by the statute of limitations.

The trial court also ruled the appellees owed no duty to Steinle: "There was no duty owed to [Steinle] by the [appellees] in this case sufficient to support an action for negligence or breach of warranty. Any duty which existed extended only to the purchasers of the property, not to the sellers."

This court's affirming the trial court's finding that the statute of limitations barred the tort causes of action disposes of the issue and there is no need to address the duty issue.

Finally, we must decide if Chicago Title has a cause of action against Steinle for subrogation.

This issue was not decided by the trial court which granted Chicago Title's motion for summary judgment, but came before another trial court for decision on the stipulated facts and exhibits. The same stipulated fact standard of review cited above applies and, again, this is a question of law over which this court can exercise unlimited review.

In December 1994, Chicago Title purchased certain real property from the KTA and gave it to the Glaesmans, in conjunction with its obligations under the title insurance policy.

The trial court ruled:

"1. The plaintiff has a valid right of subrogation in this case against the defendant. *Fenly v. Revell*, 170 Kan. 705, 228 P.2d 905 (1951).

"2. The litigation in the Butler County case did not extinguish the right of the plaintiff to pursue reimbursement against the defendant.

"3. The intent of the parties in settling the Butler County case and in reserving claims therein was to allow the reservation of the plaintiff for the present claim. The release . . . does not provide the defendant a defense to the plaintiff's claim."

The Glaesmans' title policy states:

"Whenever the Company shall have settled a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant. The Company shall be subrogated to and be entitled to all right and remedies which such insured claimant would have had against any person or property in respect to such claim had this policy not been issued, and if requested by the Company, such insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect such right of subrogation and shall permit the Company to use the name of such insured claimant in any transaction or litigation involving such rights or remedies. If the Payment does not cover the loss of such insured claimant, the Company shall be subrogated to such rights and remedies in the proportion which said payment bears to the amount of said loss. If loss should result from any act of such insured claimant, such act shall not void this policy, but the Company, in that event, shall be required to pay only that part of any losses insured against hereunder which shall exceed the amount, if any, lost to the Company by reason of the impairment of the right of subrogation."

Chicago Title's subrogation action against Steinle was for repayment of the amount it paid to buy the real property from the KTA which it deeded to the Glaesmans. During the Glaesman litigation, which began in 1993, the Steinles and Chicago Title entered into a stipulated order on October 24, 1994, allowing Chicago Title to amend its pleadings to "assert an indemnification claim against [Steinle] based upon an alleged breach of warranty of title." The order further provided that the indemnification claim would not be considered mandatory in that litigation and that the claim would be "reserved" and dismissed without prejudice.

On November 28, 1994, the trial court in the Glaesman litigation granted summary judgment in Steinle's favor on the Glaesmans' claim for breach of the covenant of seizin. The trial court held that such an action must be brought within 5 years of the date the deed is executed and that the claim was, thus, time barred. The court further found the breach of warranty claim would fail because such a claim does not accrue until the covenant is disturbed, and there was no evidence that the buyer had been evicted or that its possession had been disturbed. The Glaesman litigation was finally

settled, and the Glaesmans executed a release of their claims against the parties.

It is recognized by both parties that Steinle conveyed to the Glaesmans property she did not own. Chicago Title, as the Glaesmans' title insurer, cured that title by purchasing the adverse interest from the KTA and conveying it to the Glaesmans. The Glaesmans' owners' title insurance policy with Chicago Title provides subrogation rights to Chicago Title, allowing it to pursue the Glaesmans' rights for Steinle's breach of warranty.

As pointed out by the trial court in the Glaesman litigation, the breach of warranty claim against Steinle had not accrued at the time of the litigation because the Glaesmans had not suffered a constructive eviction. Only the covenant of seizin had been breached. The breach of warranty claim accrued when Chicago Title purchased the real property at issue, because a constructive eviction of the Glaesmans occurred then. The Glaesmans did not pursue the breach of warranty claim against Steinle because Chicago Title deeded the property to them. At that point, the breach of warranty claim of the Glaesmans passed to Chicago Title, and it had the right to pursue subrogation under that claim of its insured against Steinle.

*Fenly v. Revell*, 170 Kan. 705, 708, 228 P.2d 905 (1951), cited by the trial court, states that the doctrine of subrogation

"is a creature of equity invented to prevent a failure of justice and is broad enough to include every instance in which one party is required to pay a debt for which another is primarily answerable, and which, in equity and good conscience ought to be discharged by the latter. [Citations omitted.]"

The issue appears to be whether the subsequent settlement of the case, the Glaesmans' release of their claims against Steinle, and their cancellation of the title policy, all of which occurred after the order reserving Chicago Title's indemnification claim against Steinle, should bar Chicago Title's subrogation claim against her.

The journal entry which settled the Glaesman litigation stated, in part, that the Glaesmans' title policy was canceled, they waived all appeals and appellate rights in the litigation, and they released "all parties to this litigation from all claims herein, including parties

and claims previously dismissed or upon which judgment has been previously entered." In exchange, the Glaesmans' remaining claims against Chicago Title were dismissed with prejudice.

Chicago Title's right of subrogation is derived from the Glaesmans' rights, based on both the language of the subrogation clause in the owner's title policy at issue here and the common law of subrogation. See *Western Motor Co. v. Koehn*, 242 Kan. 402, 405, 748 P.2d 851 (1988); *Farmers Ins. Co. v. Farm Bureau Mut. Ins. Co.*, 227 Kan. 533, 608 P.2d 923 (1980). "An insurer claiming the right of subrogation stands in the shoes of its insured, and any defenses against insured are likewise good against the insurer." *Western Motor Co.*, 242 Kan. at 405.

Chicago Title relies on *Patrons Mut. Ins. Ass'n v. Union Gas System, Inc.*, 250 Kan. 722, 830 P.2d 35 (1992), where a release was issued by one of the parties against another as part of a settlement agreement. The release was titled a "limited" release and stated: "This release is a release only of the claims of [plaintiffs] individually and is not a release of claims held, if any, by their insurer, Patrons Mutual Insurance Company." 250 Kan. at 723.

*Patrons* is clearly distinguishable from the present case. There is nothing in the journal entry of settlement or the release which excepts the subrogation claims of Chicago Title from the release. Released were: "all claims herein, including parties and claims previously dismissed or upon which judgment has been previously entered." In addition, the settlement agreement canceled the Glaesmans' title insurance policy. The subrogation claim which arises from the language of the title policy cannot survive the policy's cancellation.

Also, in *Patrons*, the insurance company had filed an independent action to signal its independent desire to pursue subrogation.

Affirmed in part and reversed in part.